# In the United States Court of Federal Claims

No. 19-498
(Filed: September 7, 2022)

```
*****************************************
CONSTRUCTORA GUZMAN, S.A.,          *
                                    *
                  Plaintiff,        *
                                    *
         v.                         *
                                    *
THE UNITED STATES,                  *
                                    *
                  Defendant.        *
*****************************************
```

Motion to Dismiss; RCFC 12(b)(1); Standing; Motion for Summary Judgment; RCFC 56; The Miller Act; Third-Party Beneficiary; Retainage.

*Joseph A. McManus, Jr.*, Carlton Fields, PA, Washington, DC, counsel for Plaintiff.

*Joseph Alan Pixley*, U.S. Department of Justice, Washington, DC, counsel for Defendant.

## OPINION AND ORDER

**DIETZ, Judge.**

Plaintiff, Constructora Guzman, S.A. ("Guzman"), seeks payment from the United States for unpaid work that it completed as a subcontractor on a project to renovate the United States Embassy in Guyana. Though it did not have a contract with the United States, Guzman alleges that it was a third-party beneficiary to a modification to a contract between the Department of State ("DOS") and the prime contractor, Enviro-Management & Research, Inc. ("EMR"). The contract modification allowed DOS to retain a percentage of each payment due EMR in lieu of a requirement for EMR to furnish performance and payment bonds. Guzman alleges that this retainage was intended to guarantee payment to EMR's subcontractors and, therefore, DOS breached its obligations by releasing the retainage to EMR while Guzman went unpaid for its work.

Before the Court are the government's motion to dismiss the complaint for lack of standing and the parties' cross-motions for summary judgment. Guzman's complaint is based upon its alleged status as a third-party beneficiary, which serves as an exception to the general rule that a plaintiff must be in privity of contract with the government to have standing to sue the government for breach of contract. Accordingly, the government's motion to dismiss for lack of standing is **DENIED**. However, because Guzman cannot establish that it was an intended direct beneficiary to the DOS-EMR contract modification, the government's motion for summary judgment is **GRANTED**.

## I.   BACKGROUND

In September 2013, DOS awarded a firm-fixed price contract to EMR for the renovation of the United States Embassy in Georgetown, Guyana. [ECF 43-1] at 62-64.[1] The total contract value paid to EMR upon completion of the work in 2017 was approximately $17 million. *Id.* at 89, 113. In January 2015, EMR entered into a subcontract with Guzman for Guzman to provide construction-related services on the embassy project for $8.3 million. Compl. [ECF 1] ¶ 15; *see* [ECF 43-1] at 31. Guzman completed its work, but EMR failed to pay Guzman in the amount of $1,484,914.43. *See* [ECF 1] ¶¶ 16-19; *see also* [ECF 41-8].

This case centers around a modification to the Miller Act bonding requirement contained in the contract between DOS and EMR. *See* [ECF 43-1] at 76. The Miller Act, 40 U.S.C. §§ 3131 *et seq.*, requires prime contractors on federal construction projects to furnish a performance bond and a payment bond for the protection of the government and subcontractors, respectively. 40 U.S.C. § 3131(b)(1)-(2). The performance bond protects the government if the prime defaults on its work, and the payment bond protects subcontractors if the prime defaults on its payments. *See id.*; *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 725-26 (Fed. Cir. 2018). "A contracting officer may waive the requirement of a performance bond and payment bond for work under a contract that is to be performed in a foreign country if the officer finds that it is impracticable for the contractor to furnish the bonds." 40 U.S.C. § 3131(d).

The DOS-EMR contract incorporated the Miller Act bonding requirements as follows:

H.4.1 <u>Bonds Required</u> The Contractor shall furnish (1) performance and payment bonds . . . in the amount of 100% of the contract price for the performance bond and 100% of the contract price for the payment bond, or (2) comparable alternate security approved by the Government as authorized and in accordance with Federal Acquisition Regulation (FAR) Section/Part 28.204, Alternatives in Lieu of Corporate or Individual Sureties.

***

H.4.3 <u>Coverage</u> The bonds or alternate performance security shall guarantee the Contractor's execution and completion of the work within the contract time and the correction of any defects after completion as required by this contract, the payment of all wages and other amounts payable by the Contractor under its subcontracts or for labor and materials, and the satisfaction or removal of any liens or encumbrances placed on the work.

[ECF 43-1] at 71.

In October 2013, EMR sent a letter informing the DOS Contracting Officer that EMR was unable to obtain the required performance and payment bonds. [ECF 43-1] at 78. EMR proposed an alternative arrangement in which DOS would retain ten percent of the amounts due EMR for each invoice until certain completion milestones were met, at which point the retainage

---

[1] Pages referenced herein are to those appearing on the electronically-filed docket entry.

would be released to EMR. *Id.* As reflected in an "Action Memorandum" and emails with agency personnel, the Contracting Officer considered three options in response to EMR's failure to obtain bonds: (1) waive the payment and performance bonds for the award to EMR and withhold retainage until substantial completion is achieved in lieu of bonds; (2) terminate for convenience or default and award the contract to the next acceptable bidder; or (3) terminate for convenience or default and reprocure the solicitation. [ECF 43-1] at 95, 99-100.

In February 2014, the Contracting Officer issued a contract modification which stated that DOS would "[r]etain 10% per invoice in lieu of bonds and additional 10% if the contractor is not performing." [ECF 43-1] at 76. Because EMR would no longer be required to furnish performance and payment bonds, the modification reduced the contract price by the cost to obtain such bonds. *See id.* The modification further stated that "[a]ll other terms and conditions remain[ed] unchanged." *Id.*

The DOS-EMR contract made EMR responsible for payment of its subcontractors. *See* [ECF 43-1] at 73. Section H.33.1 required EMR to "satisfy as due all lawful claims of any persons or entities employed by the Contractor, including subcontractors, . . . for all labor performed and materials furnished under this contract, . . . unless the Government shall be directly liable therefore by contract." *Id.* at 73-74. Further, with each request for payment, EMR was required to submit to DOS a "certification of payment to subcontractors." *Id.* at 69 (capitalization modified).

During performance of the contract, DOS began receiving complaints that EMR was not fulfilling its payment obligations. *See* [ECF 43-1] at 19-20, 53; *see also id.* at 117. By letter dated July 7, 2016, DOS informed EMR that "[v]endors, subcontractors, and employees continue to contact [Overseas Buildings Operations ("OBO")] Georgetown and US Embassy Georgetown with concerns regarding delinquent and non-payment for services rendered." *Id.* at 115. The letter stated that EMR's contractually obligated certifications that it had paid its subcontractors "appear[] to have been at best, disingenuous." *Id.* DOS enclosed a list of entities from which it had received complaints and ordered EMR to "demonstrate satisfaction through written confirmation of mutual resolution from each of the entities listed in the enclosed" and to "provide written certification that all outstanding liabilities not captured by the enclosure are fully resolved."[2] *Id.* at 115-17.

As the project neared completion in April 2017, the Contracting Officer emailed at least one subcontractor to ascertain the status of payments due from EMR.  *See* [ECF 41-6]. The email read in part: "Before the [United States Government] pays out the remaining contract amount, please confirm your company has received final payment by contractor EMR. If there are outstanding invoices for supplies/services . . . please forward me a copy." *Id.* The subcontractor responded with its unpaid invoices to EMR and later followed up to indicate that it was still awaiting payment from EMR.[3] *Id.*

---

[2] The enclosure contained a list of twenty-two complaints from ten entities, none of which were Guzman. *See* [ECF 43-1] at 116.

[3] The record before the Court does not reflect whether this payment dispute and the others contained in the July 16, 2016 letter to EMR were ever resolved.

The Contracting Officer assigned negative ratings to EMR in a May 2017 Contractor Performance Assessment Report (CPAR) as a result of EMR's payment issues. [ECF 43-1] at 91. In response, EMR disputed that it had not paid its subcontractors:

> EMR has paid all subcontractors and suppliers in accordance with their subcontract agreements/contracts. The payments were made to subcontractors and suppliers based on progress payments and in similar proportions as made by OBO to EMR. Further, a variety of factors impact subcontractor/supplier payment, including: invoices not received, invoices that are inaccurate, incorrect banking information on invoices, invoices that do not belong to EMR, and accounts that need to be reconciled for final payments.
>
> EMR is not in violation of its contract with OBO, and requests that this statement be removed from the Final Evaluation submitted by OBO.

*Id*. at 93.

On October 24, 2017, EMR submitted a "Final Settlement and Pay Application" for $982,134—the amount that had been withheld by DOS both pursuant to the retainage clauses in the contract modification and for potential liquidated damages and overtime. [ECF 43-1] at 102-04; *see also id*. at 29-30. The payment application certified that "all payments due to subcontractors and suppliers have been made from previous payments received under the contract, and timely payments will be made in accordance with subcontract agreements and the requirements of Chapter 39 of Title 31, United States Code." *Id*. at 104 (capitalization modified).

Prior to DOS's approval of EMR's final payment application, an attorney for Guzman sent an email to the Contracting Officer requesting a certified copy of the payment bond covering the embassy project. [ECF No. 41-10]. The Contracting Officer responded: "[The contract] was not covered by bonds. The agreement was to withhold 10% throughout the duration of the contract as a result of EMR not being able to acquire performance and payment bonds." *Id.*

Despite internal disagreement regarding release of the retainage to EMR prior to resolution of the subcontractor payment complaints, the Project Director approved EMR's payment application on February 23, 2018. [ECF 43-1] at 104; *see also* [ECF No. 46-2]. In February 2019, the President of EMR submitted a contractor's release, discharging all claims under the contract in consideration of payment of the full contract price in the amount of $17,026,265. [ECF 43-1] at 113.

## II.    PROCEDURAL HISTORY

Guzman filed the instant complaint against the United States on April 4, 2019. *See* Compl. [ECF 1]. Guzman alleged that the government breached its contractual obligations to Guzman under alternative theories that Guzman was a third-party beneficiary to the DOS-EMR contract or that Guzman had an implied-in-fact contract with the government. *See id*. ¶¶ 27-33.

4

Under both theories, Guzman alleged that the government failed to withhold funds to pay Guzman for its work in the amount of $1,484,914.43 upon EMR's failure to pay Guzman. *Id.* ¶¶ 33, 36.

The government filed a motion to dismiss the complaint for failure to state a claim. *See* Def.'s Aug. 8, 2019 Mot. to Dismiss [ECF 10]. The Court granted the government's motion with respect to Guzman's claim for breach of an implied-in-fact contract, finding that Guzman did not allege facts sufficient to state a non-frivolous claim that Guzman and DOS entered into an implied contract. *Constructora Guzman, S.A. v. United States*, 145 Fed. Cl. 656, 662 (2019). However, with respect to Guzman's third-party beneficiary claim, the Court found that Guzman had "pled enough to plausibly suggest that the State Department intended to put itself in the position of retaining payment for the protection of subcontractors." *Id.* at 660. Noting the need for further factual development through discovery, the Court ruled that a "motion to dismiss is not the proper place to resolve the issue of the contracting officer's intent in issuing modifications to the EMR contract or whether the State Department had a duty to hold retained payment for the benefit of subcontractors." *Id.* at 661. Accordingly, only Guzman's third-party beneficiary claim remains unresolved.

Following discovery, the parties filed the dispositive motions presently before the Court.[4] *See* Pl.'s Mot. for Summ. J. [ECF 41]; Def.'s Mot. to Dismiss, &, Alt., Mot. for Summ. J. [ECF 43]. The Court held oral argument on April 27, 2022. *See* [ECF 50].

## III.   LEGAL STANDARDS OF REVIEW

A motion to dismiss for lack of standing pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") questions whether the court has jurisdiction to adjudicate the merits of the underlying dispute. RCFC 12(b)(1); *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The plaintiff bears the burden of establishing standing by a preponderance of the evidence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). "To survive a motion to dismiss for lack of standing, a complaint must contain sufficient factual matter that would plausibly establish standing if accepted as true." *Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1355 (Fed. Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (quotations and brackets omitted).

Under RCFC 56, summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). An issue is genuine if it "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material if it might impact the outcome of the suit under the governing law, while disputes that are irrelevant or unnecessary will not preclude summary judgment. *Id.* at 248. The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, which, if satisfied, shifts the burden to the non-moving party to show that a genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The Court must draw all inferences from the underlying facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio*

---

[4] The case was transferred to the undersigned on January 5, 2021. *See* [ECF 31].

*Corp.*, 475 U.S. 574, 587 (1986). However, the Court does not weigh the evidence or make findings of fact. *See Anderson*, 477 U.S. at 249.

## IV.    DISCUSSION

With limited exceptions, the "government consents to be sued only by those with whom it has privity of contract." *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984). One such exception permits a suit to be brought against the government "by an intended third-party beneficiary" to a government contract. *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999). The ability to sue under third-party beneficiary status is an "exceptional privilege," *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005) (citing *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912)), that "should not be granted liberally." *Flexfab, L.L.C.*, 424 F.3d at 1259. "In order to prove third-party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001). Whether a party is a third-party beneficiary under a contract is a mixed question of law and fact. *Id.* at 1353.

Guzman alleges that it is a third-party beneficiary to the DOS-EMR contract because, by retaining money from each payment to EMR in lieu of the bonding requirement, DOS intended to guarantee payment to EMR's subcontractors. The government argues that Guzman lacks standing to sue for contract retainage or, alternatively, that Guzman was not a third-party beneficiary to the DOS-EMR contract. The Court finds that, though Guzman has standing to assert a third-party beneficiary claim for retainage, Guzman has failed to demonstrate that it was an intended direct beneficiary under the DOS-EMR contract. Accordingly, the Court grants summary judgment for the government.

### A.    Motion to Dismiss

Relying on precedent from the Court of Claims, the government argues that Guzman lacks standing to bring its claim because it seeks money withheld as retainage. Def.'s Mot. at 18-20 (citing *United Elec. Corp. v. United States*, 647 F.2d 1082, 1087 (Ct. Cl. 1981)). In *United Electric*, the Court of Claims stated that "subcontractors, without a contractual relationship with the Government, cannot sue either in general or specifically for contract retainages." 647 F.2d at 1087. The government presents an overly narrow reading of this statement to argue that Guzman lacks standing based on the mere fact that it seeks money held as "retainage."

*United Electric* does not address the issue of third-party beneficiary status. In that case, after being denied payment by the prime contractor and the payment bond surety, a subcontractor sought to recover compensation from the government based on a theory that it had an equitable lien on the contract retainage. *See United Elec.*, 647 F.2d at 1082-83. Expressing the principle that the government must consent to be sued, the Court of Claims dismissed the suit because "[i]n the absence of a direct contractual link (express or implied-in-fact), no enforceable contractual right against the United States exists, and therefore a subcontractor, in privity only with its private prime, cannot recover directly from the Government for amounts owed it by the

prime." *Id.* at 1084. Thus, the issue with the subcontractor's claim in *United Electric* was not that it sought retainage but rather that it lacked a contractual relationship for which the United States consented to be sued.

As stated above, a party's status as a third-party beneficiary serves as an exception to the general rule that only those in privity of contract with the government may sue the government for breach of contract. *See First Hartford Corp.*, 194 F.3d at 1289. More recent cases from the Federal Circuit have permitted subcontractors to sue the government based on third-party beneficiary principles. *See, e.g.*, *D & H Distrib. Co. v. United States*, 102 F.3d 542, 548 (Fed. Cir. 1996); *J.G.B. Enters., Inc. v. United States*, 497 F.3d 1259, 1262 (Fed. Cir. 2007). Accordingly, that Guzman seeks recovery from a pool of money classified as "retainage" does not deprive it of standing. Rather, because Guzman has plausibly alleged that it was an intended third-party beneficiary to the retainage clause of the contract modification, *see Guzman*, 145 Fed. Cl. at 661, dismissal under RCFC 12(b)(1) is inappropriate. *See G4S Tech. LLC v. United States*, 114 Fed. Cl. 662, 669 (2014) (denying third-party beneficiary claim through summary judgment rather than under RCFC 12(b)(1)), *aff'd*, 779 F.3d 1337 (Fed. Cir. 2015).

### B.    Motion for Summary Judgment

Though Guzman has standing to bring its claim alleging that it is a third-party beneficiary under the DOS-EMR contract, Guzman has failed to present evidence that DOS intended to confer a *direct* benefit to Guzman. Neither the contractual language nor the actions of DOS demonstrate any express or implied intent for DOS to be responsible for payment to subcontractors. The contract modification did not establish a mechanism for DOS to pay subcontractors directly, nor did it change the express terms of the contract that made EMR solely liable for paying its subcontractors. Further, DOS's oversight of EMR's payments to its subcontractors conveys nothing more than its interest, present in all government projects, in ensuring timely and compliant completion of the project. As such, Guzman's third-party beneficiary claim fails as a matter of law.

"A nonparty becomes legally entitled to a benefit promised in a contract . . . only if the contracting parties so intend." *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 117 (2011). "In order to prove third-party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party *directly*." *Glass*, 258 F.3d at 1354 (emphasis added). Such intent may be determined through the express language of the contract or, if necessary, "inferred from the actions of the contracting officer and circumstances providing the contracting officer with appropriate notice that the contract provision at issue was intended to benefit the third party." *Flexfab*, 424 F.3d at 1262-63. "The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefitted thereby." *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997).

In conducting its analysis, the Court "must distinguish between incidental and indirect beneficiaries and direct beneficiaries because only direct beneficiaries qualify for third-party beneficiary status." *Nelson Const. Co. v. United States*, 79 Fed. Cl. 81, 95 (2007). To determine whether a subcontractor is a direct beneficiary to a contract, the Federal Circuit has cited

favorably to the following illustration as "distinguishing between intended and incidental beneficiaries based on whether a *payment is made directly to the third party*," *G4S Tech.*, 779 F.3d at 1340 (emphasis added):

> B promises A to pay whatever debts A may incur in a certain undertaking. A incurs in the undertaking debts to C, D and E. If the promise is interpreted as a promise that B will pay C, D and E, they are intended beneficiaries . . . ; if the money is to be paid to A in order that he may be provided with money to pay C, D and E, they are at most incidental beneficiaries.

Restatement (Second) of Contracts § 302 cmt. b, illus. 3 (1981). Thus, establishing third-party beneficiary status "require[s] more than a payment to a contractor's general fund, even if the government knows that subcontractors will be due certain portions of the fund." *G4S Tech.*, 779 F.3d at 1342.

Indeed, cases in which a subcontractor was found to have third-party beneficiary status involve a payment mechanism by which the subcontractor has direct access to payments made by the government. For example, in *D & H Distributing*, the Federal Circuit ruled that a subcontractor was a third-party beneficiary to a contract between the prime contractor and the government due to a joint payment clause, the "entire purpose" of which "was to provide protection for [the subcontractor] by giving it a right to control the disbursement of the contract proceeds and thereby to ensure that its invoice to [the prime contractor] would be paid." 102 F.3d at 547; *see also J.G.B Enters., Inc. v. United States*, 63 Fed. Cl. 319, 334 (2004) (finding third-party beneficiary status where the government was contractually obligated to make payments into an escrow account accessible by a subcontractor), *aff'd,* 497 F.3d 1259 (2007). On the other hand, in *G4S Technology*, the Federal Circuit found that a subcontractor was not a direct beneficiary to a payment mechanism in which the prime contractor was required to request funds attached to a specific purpose, such as payment to subcontractors, and supported by documentation, such as subcontractor invoices. 779 F.3d at 1341. The Federal Circuit reasoned that "the government made no special payment arrangements" with the subcontractors; rather, "all payments from [the government] were distributed to [the subcontractor] indirectly," through payment to the prime contractor. *Id.* at 1341-43.

Turning to the facts of this case, the express terms of the DOS-EMR contract demonstrate an intent for EMR, not DOS, to pay subcontractors directly. The contract lacks any payment mechanism requiring or permitting DOS to make direct payments to subcontractors. Rather, EMR was responsible for "satisfy[ing] as due all lawful claims of any persons or entities employed by" EMR and for certifying that it had paid its subcontractors. [ECF 43-1] at 69, 73. The contract modification, which allowed DOS to retain a portion of each payment to EMR, did not change these express terms or implement a new payment structure. *Id*. at 76 ("All other terms and conditions remain unchanged."). Guzman and other subcontractors, of course, stood to benefit from the DOS-EMR contract—in the form of payment for their work on the project. However, as in *G4S Technologies*, all payments flowed from DOS to EMR, who was then required to pay its subcontractors. As such, any benefit conveyed from DOS to Guzman was indirect—through payment to EMR—making Guzman only an incidental or indirect beneficiary.

The actions of DOS during contract performance further confirm its intent for EMR to be solely liable for payment to its subcontractors. Upon learning of EMR's payment issues, DOS sent a letter to EMR "call[ing] for immediate resolution of all fiscal liabilities associated with the project." [ECF 43-1] at 115. DOS required EMR to submit "written confirmation of mutual resolution" of outstanding liabilities "prior to [DOS's] consideration of future payment applications." *Id.* Consistent with the terms of the contract, DOS placed the burden on EMR to resolve its own debts. It provided no indication that if EMR failed to do so, DOS would use the retainage to pay subcontractors directly. Nor did it threaten to use any existing or new payment structure that would give subcontractors direct access to payments. Rather, DOS required that EMR confirm in writing that it had resolved its subcontractor payment disputes prior to consideration of future applications for payment *to EMR*. No evidence indicates that DOS ever made direct payments to any subcontractor, as DOS ultimately approved release of the full retainage to EMR, who acknowledged payment in the full amount due under the contract. *See id.* at 104, 113. Thus, DOS neither expressly nor impliedly demonstrated any intent to be directly liable for payment to EMR's subcontractors.

Guzman argues, to the contrary, that the contract modification demonstrates an intent for DOS to be directly liable to EMR's subcontractors because the retainage was meant to serve the same purpose as a payment bond—to guarantee payment to subcontractors. *See* [ECF 41] at 16. In support of its position, Guzman argues that deposition testimony shows that DOS did not waive the bonding requirement or, at least, that DOS did not waive the contractual provision indicating the purpose of the bonding requirement. *Id.* at 14-19. Guzman further points to DOS's oversight of EMR's payments to its subcontractors as evidence of its intent to guarantee payment to subcontractors. *Id.* at 19-20. Guzman's position is untenable on multiple levels.

First, DOS necessarily waived the bonding requirement because retainage is not an alternate form of security permitted by the FAR. By the terms of the DOS-EMR contract, any alternate form of security to performance and payment bonds was required to comply with FAR 28.204, which permits an entity to "furnish a certified or cashier's check, bank draft, Post Office money order, or currency, in an amount equal to the penal sum of the bond, instead of furnishing surety or sureties on the bonds." *See* [ECF 43-1] at 71; 48 C.F.R. § 28.204-2. The contract modification allowed DOS to withhold up to twenty percent retainage. This retainage neither qualifies as a form of alternate security under the FAR nor meets the requirement that the alternate security must be "in an amount equal to the penal sum of the bond," which, in this case, was the full contract price. *See* [ECF 43-1] at 71. As such, DOS necessarily waived the payment bond requirement, as is permitted by the Miller Act for foreign projects, *see* 40 U.S.C. § 3131(d), and the contractual clause defining the purpose of the "bonds or alternate performance security" is inapplicable to the retainage.

Second, the retainage did not serve the same purpose as a payment bond because, without any instruction as to how DOS was required to administer funds withheld as retainage, DOS had discretion to release the funds to EMR as a matter of contract administration. "It is true that retainage is an incentive to complete the contract, but it is equally true that contractors may need full progress payments to finance the work." *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 498 (Fed. Cir. 1990). The contract modification, which merely stated that DOS would retain funds "in lieu of bonds," did not impose any specific obligation for DOS, for example, to hold

the funds until it confirmed that subcontractors were paid or to give subcontractors access to the funds in the event of nonpayment. Though DOS could use the retainage as leverage to incentivize EMR to pay its subcontractors, it had "considerable discretion and flexibility" to release the retainage to allow EMR to satisfy its payment obligations. *See id.* Thus, whereas a payment bond surety guarantees payment to subcontractors through a Miller Act claim, DOS undertook no such obligation through the retainage clause.

Third, DOS's oversight of payments to subcontractors demonstrates its interest in ensuring completion of the project, not its intention to make itself responsible for guaranteeing payment to EMR's subcontractors. "[W]hile circumstantial evidence may establish that the government intended to bind itself to a third party, the government's conduct should be evaluated in the context of its responsibility to protect the public interest." *G4S Tech.*, 779 F.3d at 1341 (citation omitted). In response to complaints and worksite protests by subcontractors, DOS pressured EMR to fulfill EMR's own payment obligations to avoid delays and additional costs to DOS. *See* [ECF 43-1] at 115. Similarly, DOS's direct contact with subcontractors prior to approval of final payment to EMR, *see* [ECF 41-6], reflects its interests in safeguarding taxpayer funds by ensuring that EMR complied with its obligations under the contract. DOS possessed these interests, even absent any liability flowing directly from DOS to EMR's subcontractors. As discussed above, DOS never demonstrated any intent to fulfill EMR's payment obligations itself.

In sum, viewing the evidence in the light most favorable to Guzman, the Court finds that Guzman cannot show that it was an intended third-party beneficiary to the DOS-EMR contract. Neither the language of the contract nor the actions of DOS demonstrate that DOS intended to make itself directly liable to, and thus impart the "exceptional privilege" of third-party beneficiary status upon, Guzman and EMR's subcontractors.

## V.    CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss is **DENIED**. Plaintiff's motion for summary judgment is **DENIED**. Defendant's motion for summary judgment is **GRANTED**. The Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge